UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

               Plaintiff,

v.

D-1 Bharath Kakireddy,

               Defendant.

No. 19-20026-1

Hon. Gershwin A. Drain

**Offense:**
18 U.S.C. § 371
Conspiracy to commit visa fraud and
harbor aliens for profit

**Maximum Penalty:** Up to 5 years

**Maximum Fine:** $250,000

**Supervised Release:**
Up to 3 years

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Bharath Kakireddy is a foreign citizen who abused the student visa program so that he could remain and work in the United States illegally. Moreover, he and his co-conspirators recruited at least 600 foreign students to do the same. Kakireddy is criminally responsible for the recruitment of over 100 students, 93 of which he personally recruited, and in return for his recruitment efforts, he received at least $32,000 in profits. (*Exhibit 1*).   Accordingly, the United States of America respectfully recommends that the Court impose a sentence within Kakireddy's

guidelines range of **37–46 months**. Such a sentence is necessary in light of the seriousness of the offense, the need to punish Kakireddy, deter Kakireddy and others from committing the same misconduct, Kakireddy's personal characteristics and to avoid unwarranted sentencing disparities.

## I.   BACKGROUND

Defendant Bharath Kakireddy is a citizen of India who first traveled to the United States in 2014 on a temporary student visa known as an F-1 visa. (PSR ¶¶ 9, 43 and 51). Before he could obtain his F-1 visa, Kakireddy applied to study in the United States at a university through the Student and Exchange Visitor Program ("SEVP"), which is overseen by the Department of Homeland Security. (*Id.* at ¶ 10–11). Once accepted by a university—in this case Atlantis University—the school issued a "Certificate of Eligibility for Nonimmigrant Student Status," better known as a Form I-20. (*Id.* at ¶¶ 10–11, 51).

Kakireddy's Form I-20 permitted him to enter the United States, (*Id.* at ¶ 12), which he first did in 2014. (R.78: Plea Hrg. Tr., 185); (Post Arrest Interview). While in the United States, he used his Form I-20 for identification and proof of legal and academic status in the United States, and it also allowed for him to travel abroad and return to the United States. (*Id.* at ¶ 12). For his Form I-20 to remain valid, Kakireddy knew that he needed to maintain his status as a full-time student "making progress toward completion of [his] field of study," whether at his original school or any

school to which he later transferred. (*Id.* at ¶ 11); (R.78: Plea Hrg. Tr., 185).

Kakireddy's visa and Form I-20 also permitted him to participate in curricular practical training ("CPT"), which allowed him to find gainful employment as long as he continued to attend classes and make academic progress toward his degree. (PSR, ¶ 15).

From February 2017 through January 2019, undercover agents from Homeland Security Investigations ("HSI") posed as employees of the University of Farmington ("the University"), located in Farmington Hills, Michigan. (PSR at ¶ 16-17). The University had no instructors, no classes, and no educational activities. Rather, it was a fictitious university used by foreign citizens as a "pay to stay" scheme. *Id.*    Under the "pay to stay" scheme, foreign citizens would enroll with the University as "students," but they would take no classes nor attend any educational programs; instead, they would pay tuition so that the University would issue them Form I-20's that identified them as students making progress toward a degree, and if they desired, they could also seek gainful employment through the CPT program. *Id.*

On May 8, 2017, Kakireddy contacted the University to discuss enrolling in the University without attending classes in order to fraudulently maintain his immigration status. He told the Undercover Agent (UCA) that he and his friends were just looking for a way to maintain status and were not interested in attending

classes. Kakireddy was told the arrangement was not approved by the Department of Homeland Security.[1]  Below is an excerpt of that conversation:

| | |
|---|---|
| UCA: | It's, uh, not approved by the Department of Homeland Security. It would ah…We, on our end, would consider you a student. But you wouldn't have to come to a class ... |
| Kakireddy: | Uh-huh |
| UCA: | …and we like to keep it between you and us. And..since you are a friend of Santosh we could offer it to you… |
| Karideddy: | Uh-huh |
| UCA | … if that is something you are interested in. We do offer the day one CPT. And we can get you enrolled and transferred over to us before May nineteenth. |
| Karideddy: | Uh-huh….yeah, that's great…. |

(*Recorded conversation excerpt, 5/8/17*)

Later that day, Kakireddy called the University to negotiate his tuition and a fee reduction in the event his friends joined: "If I bring, like 5 people, how much can

---

[1]  It should also be noted that Kakireddy acknowledged during his May 2, 2019 guilty plea that he knew the arrangement was illegal and not approved by the Department of Homeland Security:

| | |
|---|---|
| MR. STEINGOLD: | You knew that the arrangement was not approved by the Department of Homeland Security and was illegal, right? |
| KAKIREDDY: | Yes. |

(R.78: Plea Hrg. Tr., 188, Lines 1-4).

4

you reduce it for me?" (*Recorded phone call 5/8/17 -2*). On May 15, 2017, Kakireddy submitted his application for admission into the University of Farmington. (*Exhibit 2*).

In the days and weeks that followed, Kakireddy continued his conversations with University officials regarding his enrollment in the school and to see if he could receive "a bonus" or have his fees reduced for recruiting multiple students to the school. For example, on June 14, 2017, Kakireddy sent the following email to the University:



Kakireddy eventually reached an agreement with the University whereby he would

receive a referral fee of $500 per student based on the number of students he recruited. (*Recorded phone call 7/17/17*).

In total, this conspiracy recruited over 600 foreign students to the University of Farmington. PSR ¶ 23.   Kakireddy personally recruited at least ninety-three (93) students, and he also received cash payments of at least $32,000 from the University in addition to tuition credits. (*Id.* at ¶ 21). Below, Kakireddy can be seen collecting the first payment of $5,000.00 for recruiting students from an HSI agent (whose image is obscured):



Kakireddy has pled guilty to conspiring to commit visa fraud (18 U.S.C. § 1546(a)) and harboring aliens for profit (8 U.S.C. § 1324) in violation of 18 U.S.C. § 371—without the benefit of a Rule 11 agreement, although the government did offer one. (PSR, ¶¶ 1, 4). Kakireddy's co-conspirators are the foreign citizen "students" he recruited and his co-defendants. (*Id.* at ¶¶ 18, 19).

The maximum sentence for his offense is not more than five years'

imprisonment, a maximum fine of $250,000, and an applicable term of supervised up to three years. (PSR, p. 2; ¶¶ 53, 56, 61).

## II.   SENTENCING GUIDELINES CALCULATIONS AND § 3553(a) FACTORS

### Kakireddy's Sentencing Guidelines

The government believes that Kakireddy's total offense level is 21 and his criminal history category is I, which results in a guideline range of **37–46 months**. However, the government expects that the United States Probation Department will ultimately calculate the range at 18-24 months. The difference between Probation's guidelines and the Rule 11 is two-fold. First, the Probation Department only assessed 6 points under USSG § 2L1.1(b)(2)(B) as the defendant harbored between 25-99 unlawful aliens. In the government's view, Kakireddy should be assessed 9 points as the conspiracy harbored over 600 unlawful aliens and he is responsible for acts of other conspirators that are reasonably foreseeable and within the scope of jointly undertaken criminal activity.   Second, the Probation Department found that Kakireddy was not a manager or supervisor. Because Kakireddy managed and supervised the recruitment process of at least 93 unlawful aliens, Kakireddy should be assessed 3 points under USSG § 3B1.1(a).

a.   <u>Defendant harbored 100 aliens or more</u>

Kakireddy argues that he should only be assessed 6 points under USSG §

2L1.1(b)(2)(B) for harboring between 25-99 aliens because he personally recruited 93 students. However, the conspiracy as a whole harbored over 100 aliens (R.1: Indictment, 1). Because Kakireddy is responsible for the acts of other conspirators that are within the scope of jointly undertaken criminal activity and reasonably foreseeable, he should be assessed 9 points under USSG § 2L1.1(b)(2)(C) for harboring 100 or more aliens.

> USSG § 1B1.3(B) provides that relevant conduct includes:
>
> "In the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with other, whether or not charged as a conspiracy), all acts or omissions of others that were-
>
> > (i)   within the scope of the jointly undertaken criminal activity,
> >
> > (ii)  in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for the crime.

Conduct of others "that meets all three criteria set forth in subdivisions (i) through (iii)"—*i.e.* is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity—"is relevant conduct under this provision" for which a defendant may be held accountable.

U.S.S.G. § 1B1.3 cmt. n.3(A).   In order to determine whether these criteria are met, this Court must first determine the scope of the criminal activity the particular defendant agreed to undertake. *Id*. n.3(B).

In *United States v. Donadeo*, 910 F.3d 886, 895-896 (6th Cir. 2018), the Sixth Circuit adopted the Seventh Circuit's relevant factors list in *United States v. Salem*, 657 F.3d 560, (7th Cir. 2011) to determine the scope of the criminal activity a defendant agreed to jointly undertake. The factors include: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme. *Id*. at 895.

In this case, the factors support a finding that the scope of Kakireddy's jointly undertaken criminal activity is broad enough to include the conduct of his co-conspirator, Santosh Sama – who alone recruited almost 500 students. *United States v. Sama*, 19-cr-20026 – (R.80: Plea Tr. 271).

First, Kakireddy and Sama were engaged in a single scheme with a shared objective - to refer students to the University of Farmington in exchange for money or reductions in tuition. Second, Kakireddy and Sama harbored aliens in the same manner; they facilitated the receipt of fraudulent I-20's for their "students" knowing that these aliens remained in the United States in violation of law. Kakireddy and

Sama also coordinated their activities. Kakireddy was referred to the University by Sama. (R.78: Plea Tr. 189-190). In addition, during his plea colloquy, Kakireddy acknowledged working with Sama to recruit students:

| | |
|---|---|
| MR. STEINGOLD: | Well, the person that – one of the people that you worked with was Defendant Santosh Reddy Sama, correct? |
| KAKIREDDY: | Yes. He is the one who gave me the admission. |
| | …. |
| MR. STEINGOLD: | You did not know their names but you know that other people did the same thing as you and Santosh? |
| KAKIREDDY: | Yeah. |
| MR. STEINGOLD: | And that is that you were recruiting students and you were trying to get paid for it? |
| KAKIREDDY: | Yes. |

Perhaps the best example of their coordination was their assistance to the same student, Shashikanth Konjarla, as illustrated in the emails below:

**From:** Bharath k
**To:** ▮▮▮▮
**Subject:** Re: Tuition fee
**Date:** Thursday, February 15, 2018 2:14:56 PM

Hello Mr ▮ ,

Any update on the fee receipt.Please try to deduct the money from my account and add to my friend names below.And send me the invoices so that I can share them .And I have sent you the list of students to you 2 weeks back.And my friend Shashi kanth konjarla received email from university today to pay fee if not his sevis will terminate so please try to deduct fee from my account of the below two students.i am trying to call you since 1 week on call but it seems you are busy.please call me once if you get a chance on my number ▮24-360-9800▮.

1. Shashikanth konjarla( student id 20170602411)▮ejswi banda
▮.sai Tejaswi Banda

Thanks
Bharath

**From:** santoshreddy sama
**Sent:** Monday, June 5, 2017 1:39 PM
**To:** ████████@universityoffarmington.edu
**Subject:** New candidate

First name: ████████
Last name : ██████
Email ██████████@gmail.com
(7000$)
First name: Shashikanth
Last name konjarla
Shashikanth.konjarla@gmail.com. Please send him i20 and I'd card
ASAP he was in job so he needs cpt i20 immediately, his sevis has
been transferred to u , please check it and do it
fast .

Thank you

There is no evidence that Kakireddy and Sama pooled their resources. The fifth factor is the knowledge and scope of the scheme. As noted above, Kakireddy admitted working with Sama and knew that he, and others, were recruiting students to the University for money. This factor supports a finding that the scope of Kakireddy's jointly undertaken criminal activity was broad enough to include Sama's conduct. The last factor is the length and degree of the defendant's participation in the scheme. Kakireddy participated in this scheme for almost 18 months during which he recruited 93 students, only second in number to Sama.

Furthermore, the acts of Sama were reasonably foreseeable to Kakireddy. Sama referred Kakireddy to the University. (R.78, Plea Tr., 189-190). Kakireddy worked with Sama to recruit students. *Id*. And Kakireddy knew that Sama was also

recruiting students. *Id*. "[A]ctual knowledge necessarily satisfies the lesser reasonable-foreseeability standard." *United States v. Anderson*, 795 F.3d 613, 617 (6th Cir. 2015). As such, in connection with his criminal activity, Kakireddy could have reasonably foreseen that Sama's conduct included the harboring of at least 7 additional students to the University – bringing his total number of harbored students to 100 or more. Therefore, Kakireddy should be assessed 9 points under USSG § 2L1.1(b)(2)(C) for harboring 100 or more aliens.

ii.   <u>Kakireddy was a manager or supervisor under § 3B1.1(b) or, alternatively an organizer under § 3B1.1(c)</u>

To qualify for a 3-point enhancement under USSG § 3B1.1(b), Kakireddy must have a managed or supervised one or more of the participants and the criminal activity must have involved five or more participants or was otherwise extensive. USSG § 3B1.1(b); cmt. 2. "The burden of proving when the enhancement is appropriate is low: "'[T]here need only be evidence to support a finding that the defendant was a manager or supervisor of at least one other participant in the criminal activity....' "" *United States v. Beard*, 394 Fed. Appx. 200, 205 (6th Cir. 2010) (quoting *United States v. Henley,* 360 F.3d 509, 517 (6th Cir. 2004)). Control of subordinates is not necessary; Kakireddy need only supervise or manage them. *United States v. Johnson*, 736 Fed. Appx. 568, 572 (6th Cir. 2018).

In determining the defendant's organizational role, and distinguishing

12

between a leader and manager, <u>Application Note 4</u> of § 3B1.1 identifies a number of non-exhaustive factors the Court can consider, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See also United States v. Lalonde*, 509 F. 3d 750, 765-66 (6th Cir. 2007).

Here, Kakireddy's 93 recruited students are undoubtedly participants in the criminal activity. Beyond recruiting these students to the University of Farmington in exchange for at least $32,000, Kakireddy managed all of their paperwork, submitted the student's applications, received their acceptance letters, arranged their "start" date, requested deferrals on student's behalf, and facilitated the acceptance of fee receipts/SEVIS transfers.

Among many others, the emails below illustrate Kakireddy's managerial role:

**From:** Bharath k
**To:** Admissions; ▮▮▮▮▮
**Subject:** Re: February Intake Applications
**Date:** Tuesday, January 16, 2018 7:41:02 PM
**Attachments:** ▮▮▮▮▮ Admission Letter.pdf
▮▮▮▮▮ Admission Letter.pdf
UF Intl Application_▮▮▮.pdf
UF Intl Application_▮▮▮.pdf
UF Intl Application_▮.pdf
UF Intl Application_▮▮.pdf
UF Intl Application_▮▮▮.pdf
UF Intl Application_▮▮▮.pdf

Hello Mr ██ ,

Please find the Attachments of the Application Forms for the Feb intake and Among That Two has acceptance Letters (████ & ████ )for January and try need the new Acceptance Letters for February Intake with the updated date of start date.

And second thing is Please try to deduct the money from my account add to my friend name ████ ████ with student id ████ has to pay his tuition fee due by 12/29/2017. And try to send me his fee receipt as well so that I can share him. Regarding This we has spoken in December.

First name :
Last name :
Email id : ████ @gmail.com

First name :
Last name :
Email id : ████ @gmail.com

First name :
Last name :
Email : ████ @gmail.com

First name :
Last name :
Email : ████ @gmail.com

First name :
Last name :
Email : ████ @gmail.com

First name :
Last name :
Email : ████ @gmail.com

First name :
Last name :
Email : ████ @gmail.com

First name :
Last name :
Email : ████ @gmail.com

Thanks,
Bharath

---

**From:** Bharath k
**Sent:** Monday, November 27, 2017 12:59 PM
**To:** Admissions; ████
**Subject:** Re: Admission

Hello mr ██ .

Please send me the acceptance letters of the the applications which I have shared you and please send the acceptance letter of ████ as soon as you for this semester so that he can transfer the sevis immediately and rest for the Jan intake.

First name : ████
Last name : ████

14



Email id : ███████████@gmail.com

_____

**From:** Bharath k
**To:** ███████
**Subject:** Fee payment ███████████
**Date:** Friday, October 20, 2017 12:13:51 PM

Hello Mr ███ ,

One of my friend ███████████ with Email id ███████████@gmail.com .He Didn't Got Fee receipt For Paying the fee Please send him the fee receipt invoice so that he can pay the fee. He has send you the email regarding it please try to send him the invoice for the fee payment.

Thanks,
Bharath

## The 3553(a) Factors

In determining an appropriate sentence, the Court should use the Sentencing Guidelines as a "starting point and the initial benchmark." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Indeed, a sentence within the guidelines range carries a "rebuttable presumption of reasonableness." *United States v. Buchanan*, 449 F.3d 731, 734 (6th Cir. 2006). This is so because the guidelines "represent nearly two decades of considered judgment about the range of sentences appropriate for certain offenses." (*Id.* at 736) (Sutton, J., concurring). In particular, the guidelines aggregate the "sentencing experiences of individual judges, the administrative expertise of the [Sentencing] Commission, and the input of Congress…." *Id.*

Beyond the Guidelines, the Court should consider all of the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The § 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

15

(2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
> > ***
(6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct….

18 U.S.C. § 3553(a).

Kakireddy's conduct in this case demonstrates why a sentence within the guidelines is appropriate. Kakireddy may suggest his role in committing fraud and harboring illegal aliens for profit stemmed from his attempt to help foreign national students obtain an education—including for some students who sought to transfer from schools that were in danger of losing their accreditation.[2] But his and his students' aims were not so noble.

Their true intent could not be clearer. While "enrolled" at the University, one hundred percent of the foreign citizen students <u>never</u> spent a single second in a

---

[2] These schools cater to "students" who want to exploit our foreign student education program. While they are the exception rather than the rule, unfortunately they do exist. Some of the "pay to stay" schools located around the United States that have been exposed over the years are: Prodee University; Neo-America Language School; Walter Jay M.D. Institute; the American College of Forensic Studies; Likie Fashion and Technology College; Tri-Valley University; Herguan University; the University of Northern Virginia; and the American College of Commerce and Technology.

classroom. If it were truly about obtaining an education, the University would not have been able to attract anyone, because it had no teachers, classes, or educational services. Instead, Kakireddy and the foreign nationals he recruited wanted to commit a fraud upon the United States. At the outset, Kakireddy informed his recruits there would be no classes and no education. The "students" willingly paid thousands of dollars to the undercover agents so that they could obtain fraudulent documents (Form I-20's) that would allow them to illegally stay, re-enter, and work in the United States.

But Kakireddy's conduct was much more offensive than that of his recruits. Once he knew exactly what the University was—a fraud—he, not the University, raised the idea of recruiting other students who would be willing to commit fraud. He did so in order to make money. Specifically, in exchange for finding, enlisting, and managing all of the paperwork for others to illegally remain in the United States, he received more than $32,000 in profits and tuition credits. Hence, his illegal arrangement with the University proved to be quite profitable for him.

Therefore, Kakireddy's conduct necessitates a guidelines sentence, and there are no legitimate reasons to vary below that range. (PSR ¶ 71.)   Nonetheless, under our immigration laws, Kakireddy must be sentenced to at least 12 months in custody to permanently bar him from re-entering the United States. Such a bar is certainly fitting in this case, since Kakireddy intentionally exploited our student visa system

for his own financial gain. He did so with the full knowledge that most of his recruits wanted to illegally enter the United States job market while unlawfully remaining in the United States. As a direct result of his actions, his recruited students—who were illegally working in the United States—deprived otherwise qualified individuals of employment or training opportunities.

### A.    Sentencing Reform Act factors

#### 1.    Seriousness of the offense

Kakireddy's decision to conspire to harbor aliens and commit visa fraud is a serious offense, as indicated by Congress's decision to authorize up to five years in prison for the offense. *See* 18 U.S.C. § 371; (PSR, ¶ 57). Specifically in this case, the F-1 student visa program is designed to promote and encourage foreign students to study at American institutions. (PSR, ¶ 9–15). Once they finish their course of study, the students must leave within 15 days. (*Id.* at ¶ 13). The idea is that the students return to their native countries to share their new knowledge and skills for the betterment of themselves and their country. Accordingly, the F-1 student visa program is not a naturalization program—i.e., it is not intended to be a path to obtaining U.S. citizenship.

If he receives a guidelines sentence, Kakireddy will be deported once he serves his sentence, and he will be permanently barred from returning to the United States in the future. And even without a permanent bar from a guidelines sentence,

Kakireddy will likely be deported, and there is no way to know whether he will return to the United States. Yet his likely deportation should not trigger a variance windfall.

The Sixth Circuit has been clear that 18 U.S.C. § 3553 requires that the defendant's sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Deportation is not part of the defendant's sentence. Many things that happen to a defendant following his conviction and sentence are "impermissible facts" in determining a sentence. *Id.* Things such as losing a professional license, paying legal fees, suffering embarrassment or a damaged reputation, or as is the case here, being deported, are not part of this Court's sentence.  "None of these things are [the defendant's] sentence. Nor are they consequences of his sentence," and a district court should therefore sentence the defendant "without considering these factors." *Id.*

Furthermore, Kakireddy and his co-conspirators (his recruited students) ignored the purpose of the F-1 student visa program. In fact, Kakireddy has remained in the United States since 2014, totaling over five years in the United States before he was arrested on January 31, 2019. (*Id.* at ¶ 4). During his time with the University, Kakireddy illegally obtained employment as an analyst/software engineer making approximately $70,000 a year. (*Id.* at ¶ 54-55). Those jobs could have gone to U.S.

citizens or to other foreign students who were lawfully in the United States on valid visas.

### 2. Deterrence, protection of the public, and nature and circumstances of the offense

As noted above, Kakireddy will likely be deported, and thus the likelihood of him re-engaging this same criminal conduct is highly unlikely. However, the Court's contemplation of §3553 factors regarding deterrence and protection of the public is not solely limited to whether the defendant is likely to be a recidivist. Rather, this Court is likewise required, in determining an appropriate sentence, to seek to deter others from committing such crimes and protect the public. This Court should do so in this instance. According to an SEVP summary issued by U.S. Immigration and Customs Enforcement in November 2016, 1.23 million foreign students were studying in the United States on student visas in 2016, and 8697 schools were certified to enroll international students.[3] A within guideline sentence for Kakireddy would invariably serve as a warning and act as deterrence to any of the other one million other foreign students that are currently studying on student visas in the United States who may contemplate engaging in similar such conduct.

Additionally, this action and the related actions—19-cr-20024 and 19-cr-20025—have garnered considerable media attention since the indictments were

---

[3] https://www.ice.gov/doclib/sevis/pdf/byTheNumbersDec2016.pdf (p.2).

unsealed. Presumably, the sentences in this case and the related cases will also receive media focus. As a result, strong sentences against Kakireddy and the other defendants would have a considerable chance of deterring other foreign students—and some schools—from abusing the F-1 student visa program. In addition, as indicated by the success Kakireddy and the other defendants had in recruiting students to the University, their vast network of students and potential students, at the very least, could be deterred by guidelines sentences.

In light of the above, a deterrent prison sentence between 37 and 46 months is appropriate.

### 3.   Characteristics of the defendant

Kakireddy indicated he has a loving and supportive family in India. (PSR, ¶¶ 43-45). He attended a university in India and obtained a degree in engineering, and he also earned a Master's degree from Silicon Valley University in computer science. Thus, he has received support, love, and opportunities that many defendants who appear before this Court have not, and yet he still chose to commit the instant offense. As a result, Kakireddy's personal characteristics counsel that a prison sentence of 37–46 months is appropriate.

### 4.   Need to avoid sentencing disparities

The Supreme Court reiterated in *Booker* that reducing sentencing disparities was Congress's basis statutory goal in passing the Federal Sentencing Guidelines.

*United States v. Booker*, 543 U.S. 220, 250, 264 (2005). Thus, calculating and analyzing the guidelines is the primary driver in avoiding unwanted sentencing disparities. *Id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Indeed, by correctly calculating and considering the Sentencing Guidelines, the Court automatically gives "significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). A variance in this matter would result in unwanted sentencing disparities.

Furthermore, a variance based on deportation would be contrary to the dictates of 18 U.S.C. § 3553 (2)(A) which requires that the defendant's sentence reflect the seriousness of the offense (see above). By allowing the Court to consider deportation as grounds for a downward variance for illegally harboring aliens, it would invariably grant the Court the authority to vary for an alien yet bar similar such consideration for an equally culpable defendant, who happens to be a U.S. citizen, and not subject to deportation. In essence, it would reward an alien while punishing a United States citizen for committing the exact same offense. This is universally unfair and would likewise run afoul of 18 U.S.C. Section 3553(a)(6) which mandates that the Court's sentence should "… avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Here, Kakireddy sought to abuse the student visa program so that he could

remain and work in the United States illegally. While illegally present in the United States he chose to line his own pockets when he proposed illegally making money by managing, harboring and recruiting other foreign students to do the same.   In return for his recruitment efforts, he received more than $32,000 in profit.   Such calculated criminal acts do not warrant a downward variance.

Therefore, this factor favors a prison sentence within the guidelines range of 37–46 months. However, the Court should also be mindful of the other five recruiters charged in this case, for whom it will have to impose sentences in the near future. Like Kakireddy, those recruiters helped enlist hundreds of foreign citizens to enroll at the University with the goal of fraudulently maintaining their status in the United States. *See United States v. Kakireddy et al.*, No. 19-cr-20026 (E.D. Mich.) (Dkt. # 1, PgID 9).

## III.   CONCLUSION

For the reasons stated above, the government recommends this Court sentence Kakireddy within the existing guideline range of 37–46 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/ Timothy P. McDonald*
Timothy P. McDonald
Ronald W. Waterstreet
Brandon C. Helms
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9100
Email: Ronald.Waterstreet@usdoj.gov
Email: Timothy. McDonald@usdoj.gov
Email: Brandon.Helms@usdoj.gov

Dated: August 15, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will provide notification to all counsel of record.

*/s/Timothy P. McDonald*
Timothy P. McDonald
Assistant United States Attorney
